IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA15-155

Filed: 16 February 2016

Wake County, Nos. 14 CVS 4003, 14 CVS 4307

LOUIS CHERRY and MARSHA GORDON, Petitioners

v.

GAIL WIESNER, CITY OF RALEIGH, and RALEIGH BOARD OF ADJUSTMENT, Respondents.


CITY OF RALEIGH, a municipal corporation, Petitioner


v.


RALEIGH BOARD OF ADJUSTMENT, LOUIS W. CHERRY, III, MARSHA G. GORDON, and GAIL P. WIESNER, Respondents.


Appeal by respondent Gail Wiesner from order entered on 15 September 2014 by Judge Elaine M. O'Neal Bushfan in Superior Court, Wake County. Heard in the Court of Appeals on 26 August 2015.

*Kilpatrick Townsend & Stockton LLP, by Joseph S. Dowdy and Phillip A. Harris, Jr., for petitioner-appellees Louis Cherry and Marsha Gordon.*

*City of Raleigh Attorney Thomas A. McCormick, by Deputy City Attorney Dorothy K. Leapley and Associate City Attorney Nicolette Fulton, for petitioner-appellee City of Raleigh.*

*Petesch Law, by Andrew J. Petesch, for respondent-appellant Gail Wiesner.*

STROUD, Judge.

**Synopsis of Opinion**

Gail Wiesner ("respondent") lives across the street from the single-family "modernist" design home of Louis Cherry and Marsha Gordon ("petitioners") in Raleigh's Oakwood neighborhood. Oakwood is a designated historic district, where the design of new construction must be approved by the Raleigh Historic Development Commission ("the Commission"). As required by the rules of the historic district, before building on their vacant lot, petitioners applied for a certificate of appropriateness to build their new home ("the Cherry-Gordon house"). When the Commission held hearings to consider the application, respondent and others objected to petitioners' proposed modernist design because they considered it incongruous with the other houses in the historic district. After a series of hearings, the Commission approved the design, but then the Raleigh Board of Adjustment ("the Board") rejected the design. Petitioners then appealed the Board's ruling to the Superior Court, which reviews decisions of the Board and the Commission to make sure that their rulings comply with the law. The Superior Court reversed the Board's decision, which meant that the Commission's decision to approve the design was affirmed.[1] This opinion addresses respondent's appeal from the Superior Court's ruling.

---

[1] We refer to the Cherry-Gordon house as an existing home instead of a proposed home, since petitioners elected to proceed with construction of the home despite the pendency of this appeal, understanding the risk that they could be required to demolish it.

The Superior Court did not rule on the question of the Cherry-Gordon house's modernist design and the claim of "incongruity" with the historic district but decided that respondent did not have legal standing to challenge the approval of the design. A person who brings a legal action challenging a land use decision like this one must have "standing" to bring the action. The applicable statute gives "standing" only to an "aggrieved party," as the law defines that term. Although respondent lives across the street from the Cherry-Gordon house, the location of her home does not automatically give her standing to challenge the issuance of the certificate. A nearby landowner has standing to challenge a land use decision like this one only if the new construction will cause him to suffer some type of "special damages" distinct from other landowners in the area. Usually, special damages include economic damages such as a decrease in property value and other direct adverse effects on the property of the landowner challenging the proposed land use, such as smoke, light, noise, or vandalism created by the new property use, which are different from the effects on the rest of the neighborhood. Respondent's claims of damages from the Cherry-Gordon house are all essentially aesthetic, since she believes the house does not fit in with the historic neighborhood and is unpleasant for her to see from her home across the street. Even if she is correct in her assessment of the Cherry-Gordon house's design, respondent has failed to show that she is an "aggrieved party" as the law

defines that term, so the Superior Court's order reversing the Board's decision was correct and we affirm it.

## I.     Background

On or about 23 August 2013, petitioners filed an Application for Certificate of Appropriateness with the Commission seeking a determination that their plan for the construction of the Cherry-Gordon house on a vacant lot in the Oakwood Historic District of Raleigh was not incongruous with the guidelines of the City of Raleigh. On 9 September 2013, the Certificate of Appropriateness Committee of the Commission ("the Committee") held a hearing on petitioners' application and voted to approve in part their application ("design approval") subject to certain conditions and to defer consideration of the Cherry-Gordon house's windows until a subsequent hearing. On 7 October 2013, the Committee held a second hearing and voted to approve petitioners' application regarding the proposed windows ("window approval"). On 17 September 2013, respondent gave notice of an intention to appeal the Committee's design approval decision to the Board, and on 24 October 2013, respondent gave notice of an intention to appeal the Committee's window approval decision to the Board. On 24 October 2013, petitioners purchased a building permit from the City of Raleigh and began construction of the Cherry-Gordon house pursuant to the certificate of appropriateness.

On or about 7 November 2013, respondent, through counsel, submitted her Application for Review of the Committee's design approval decision with the Board. The Application for Review form includes the following question: "**EXPLAIN TO THE BOARD HOW YOU ARE AN AGGRIEVED PARTY**[.]" (Emphasis in original.) Respondent answered: "As a resident adjacent to the subject property and a property owner in the Oakwood Historic District, I opposed and sought the denial of the Application for Certificate of Appropriateness, No. 135-13-CA, for 516 Euclid Street." Respondent also stated:

> The structure as proposed is incongruous to the Oakwood Historic District. It will harm the character of the neighborhood and contribute to erosion of the neighborhood's value as an asset to its residents, to the surrounding communities, to the businesses it supports, to in-town and out-of-town visitors, and to the City as a whole.

Respondent also alleged that the Committee made various procedural errors.

On or about 6 December 2013, respondent, again through counsel, submitted a substantively identical Application for Review of the Committee's window approval decision to the Board. Under the "**EXPLAIN TO THE BOARD HOW YOU ARE AN AGGRIEVED PARTY**" question, respondent answered:

> As a resident adjacent to the subject property and a property owner in the Oakwood Historic District, I opposed and sought the denial of the Application for Certificate of Appropriateness, No. 135-13-CA, for 516 Euclid Street at both the Sept. 9, 2013 and Oct. 7, 2013 public hearings before the Certificate of Appropriateness Committee.

Respondent also stated:

> The windows proposed for the dwelling structure are incongruous to the Oakwood Historic District. It will harm the character of the neighborhood and contribute to erosion of the neighborhood's value as an asset to its residents, to the surrounding communities, to the businesses it supports, to in-town and out-of-town visitors, and to the City as a whole.

Respondent again alleged that the Committee made various procedural errors.

The Commission answered respondent's pleadings and moved to dismiss her appeal to the Board for lack of standing.[2] On 13 January 2014, the Board held a hearing on respondent's appeal and the Commission's motion to dismiss for lack of standing but postponed rendering its decision until a 10 February 2014 hearing. The Board invited the parties to submit written responses by 31 January 2014. On or about 31 January 2014, respondent filed a brief in which she argued:

> [T]he Record is sufficient to demonstrate that she will suffer special damages distinct from the rest of the community if an incongruous structure is constructed directly across the street from her home. However, should the Board need additional evidence as to special damages, [respondent] requests that she be permitted to present such evidence to the Board.

At a 10 February 2014 hearing, the Board announced its ruling to reverse the Commission's decision but did not directly address the issue of standing.

---

[2] The record does not provide a date for the Commission's answer and motion to dismiss.

On or about 20 February 2014, petitioners moved to alter or amend the judgment. On or about 10 March 2014, the City of Raleigh filed procedural objections to the Board's proposed findings and conclusions, including an argument that the Board had not addressed the issue of standing. At a 10 March 2014 hearing, the Board announced its ruling denying petitioners' motion and voted to approve the minutes of the 10 February 2014 hearing. The Board's counsel noted:

> With regard to this standing issue, I don't know that the Board is equipped to determine whether or not [respondent] sustained special damages, but I do—do believe that, by continuing with the hearing, that that was tantamount to making a determination that standing did exist. And, certainly, that is something that's preserved on the record for the City [of Raleigh] to appeal.

On 28 March 2014, petitioners filed a petition for writ of certiorari and a motion to stay in the Superior Court in Wake County, arguing that respondent lacked standing, among other arguments. On 31 March 2014, the Clerk of Superior Court for Wake County granted petitioners' petition and issued a writ of certiorari. On 31 March 2014, petitioners moved for a temporary restraining order and a preliminary injunction. On 2 April 2014, the trial court granted petitioners' motion for a temporary restraining order. The trial court ordered that respondent "shall cease, desist and refrain from enforcing" the Board's decision and "any subsequent threat of a Stop Work Order" and that petitioners "shall cease work" on the Cherry-Gordon house, provided that they "are allowed to preserve the property from ruin by wind,

water, mildew, vandalism, as well as potential harm to trespassers[.]" On 2 April 2014, the City of Raleigh also filed a petition for writ of certiorari also arguing that respondent lacked standing, among other arguments. On 2 April 2014, the Clerk of Superior Court for Wake County granted the City of Raleigh's petition and issued a writ of certiorari. On 11 April 2014, the trial court granted petitioners' motion for a preliminary injunction.

On 7 August 2014, in both certiorari proceedings, respondent moved to supplement the record to include two affidavits addressing the issue of standing. On 14 August 2014, respondent answered both petitioners' and the City of Raleigh's petitions and moved to strike certain allegations and exhibits included in petitioners' petition. On 15 August 2014, the City of Raleigh moved to supplement the record to include certain documents that were before the Committee but were missing from the Board's record. On 22 August 2014, petitioners responded to respondent's motion to strike and moved to supplement the record. On 22 August 2014, petitioners also responded to respondent's motion to supplement, noting that respondent could have introduced the two affidavits about nine months earlier when she first appealed to the Board. The trial court held a hearing on 25 and 26 August 2014. On 25 August 2014, the City of Raleigh orally moved to consolidate the two certiorari proceedings. On 8 September 2014, the trial court granted the City of Raleigh's motion to supplement the record and motion to consolidate.

On 15 September 2014, the trial court entered an order in which it (1) concluded that respondent lacked standing and thus reversed the Board's decision; (2) affirmed the Commission's decisions; (3) denied respondent's motion to supplement the record; and (4) denied respondent's motion to strike and petitioners' motion to supplement the record as moot. On 3 October 2014, respondent gave timely notice of appeal.

## II.    Discussion

Respondent argues that the trial court erred in (1) concluding that she lacked standing to appeal the Commission's decisions to the Board; (2) finding that respondent had the opportunity to allege standing before the Board; (3) denying respondent's motion to supplement the record; (4) failing to determine what competent, material, and substantial evidence was before the Committee; (5) concluding that competent, material, and substantial evidence in the whole record supported the Committee's findings of fact and that the Committee's decisions were not arbitrary; and (6) concluding that the Committee did not act outside the scope of its authority or apply improper standards or interpretations of standards. Because we hold that respondent lacked standing to appeal the Committee's decisions to the Board, we do not address issues (4), (5), and (6).

A.    Standing

    i.    Standard of Review

"Standing is a necessary prerequisite to a court's proper exercise of subject matter jurisdiction, and is a question of law which this Court reviews de novo." *Smith v. Forsyth Cty. Bd. of Adjust.*, 186 N.C. App. 651, 653, 652 S.E.2d 355, 357 (2007) (citations, quotation marks, and brackets omitted).

ii.     Analysis

The party invoking jurisdiction has the burden of proving the elements of standing. *Neuse River Found., Inc. v. Smithfield Foods, Inc.*, 155 N.C. App. 110, 113, 574 S.E.2d 48, 51 (2002), *disc. review denied*, 356 N.C. 675, 577 S.E.2d 628 (2003). As a jurisdictional requirement, standing relates not to the power of the court but to the right of the party to have the court adjudicate a particular dispute. North Carolina courts began to use

> the term "standing" in the 1960s and 1970s to refer generally to a party's right to have a court decide the merits of a dispute. Standing most often turns on whether the party has alleged "injury in fact" in light of the applicable statutes or caselaw. Here, we must also examine the forms of relief sought. *See* [*Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*], 528 U.S. 167, 185, 145 L. Ed. 2d 610, 629 (2000) ("a plaintiff must demonstrate standing separately for each form of relief sought").

*Id.* at 114, 574 S.E.2d at 52 (citations omitted).

Since standing is a jurisdictional requirement, the party seeking to bring her claim before the court must include allegations which demonstrate why she has standing in the particular case:

> Since the elements of standing are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.

*Id.* at 113, 574 S.E.2d at 51 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 119 L. Ed. 2d 351, 364 (1992)) (brackets omitted). "It is not necessary that a party demonstrate that injury has already occurred, but a showing of immediate or threatened injury will suffice for purposes of standing." *Mangum v. Raleigh Bd. of Adjust.*, 362 N.C. 640, 642-43, 669 S.E.2d 279, 282 (2008) (quotation marks omitted).

In the context of an appeal regarding a land use decision such as this case, N.C. Gen. Stat. § 160A-400.9(e) sets forth both the proper court to consider the appeal and the requirements of standing for parties seeking review:

> An appeal may be taken to the Board of Adjustment from the commission's action in granting or denying any certificate, which appeals (i) may be taken by *any aggrieved party*, (ii) shall be taken within times prescribed by the preservation commission by general rule, and (iii) shall be in the nature of certiorari. Any appeal from the Board of Adjustment's decision in any such case shall be heard by the superior court of the county in which the municipality is located.

N.C. Gen. Stat. § 160A-400.9(e) (2013) (emphasis added).

Thus, "any aggrieved party" may appeal a decision of a board of adjustment[3] to the superior court in the county where the municipality is located. *See* N.C. Gen. Stat. § 160A-400.9(e). Our case law has further defined the term "aggrieved party," particularly in the context of land use disputes:

> Aggrieved parties include owners of property upon which restrictions are imposed and those who have sustained pecuniary damage to real property in which they have an interest. Not only is it the petitioner's burden to prove that he will sustain a pecuniary loss, but he must also allege the facts on which the claim of aggrievement is based. The petition must therefore allege the manner in which the value or enjoyment of petitioner's land has been or will be adversely affected. Examples of adequate pleadings include allegations that the rezoning would cut off the light and air to the petitioner's property, increase the danger of fire, increase the traffic congestion and increase the noise level. Once the petitioner's aggrieved status is properly put in issue, the trial court must, based on the evidence presented, determine whether an injury has resulted or will result from the zoning action.

*Kentallen, Inc. v. Town of Hillsborough*, 110 N.C. App. 767, 769-70, 431 S.E.2d 231, 232 (1993) (citations, quotation marks, and brackets omitted). "[T]o be considered an 'aggrieved person' and thus have standing to seek review, a party must claim special damages, distinct from the rest of the community." *Casper v. Chatham Cty.*, 186 N.C. App. 456, 458, 651 S.E.2d 299, 301 (2007).

---

[3] "The board of adjustment shall hear and decide appeals from decisions of administrative officials charged with enforcement of the zoning or unified development ordinance and may hear appeals arising out of any other ordinance that regulates land use or development[.]" N.C. Gen. Stat. § 160A-388(b1) (2013).

A reduction in value of property may be part of the basis for standing, but diminution in value alone is not sufficient:

> A property owner does not have standing to challenge another's *lawful* use of her land merely on the basis that such use will reduce the value of her property. However, where the challenged land use is prohibited by a valid zoning ordinance, the owner of adjoining or nearby lands, who will sustain special damage from the proposed use through a reduction in the value of his own property, does have a standing to maintain an action to prevent the use.
>
> Additionally, in [*Mangum*], our Supreme Court held that the petitioners in that case had standing to maintain their suit where the petitioners: (1) challenged a land use that would be unlawful without a special use permit; (2) alleged they would suffer special damages if the use is permitted; and (3) provided evidence of increased traffic, increased water runoff, parking, and safety concerns, as well as the secondary adverse effects that would result from the challenged use. 362 N.C. at 643-44, 669 S.E.2d at 282-83. Recently, this Court applied the standard set forth in [*Mangum*] and concluded that a petitioner challenging her neighbor's application for a use permit on the basis that the proposed use would reduce the value of the petitioner's property was sufficient to establish the petitioner had standing. [*Sanchez v. Town of Beaufort*, 211 N.C. App. 574, 579, 710 S.E.2d 350, 353-54, *disc. review denied*, 365 N.C. 349, 717 S.E.2d 745 (2011).]
>
> We discern no meaningful distinction between [*Mangum*], *Sanchez*, and the present case. Here, petitioners testified to their concerns that the alleged unlawful approval of the Training Facility would increase noise levels, had the potential to result in groundwater and soil contamination, and threatened the safety of anyone on their property due to stray bullets. These problems, petitioners contend, would result in a decrease in their property values. We conclude this evidence was sufficient to establish standing to challenge [the intervenor-

respondent's] proposed land use.

*Fort v. Cnty. of Cumberland*, 218 N.C. App. 401, 404-05, 721 S.E.2d 350, 353-54 (citations and quotation marks omitted), *disc. review denied*, 366 N.C. 401, 735 S.E.2d 180 (2012).

The fact that respondent owns property "immediately adjacent to or in close proximity to the subject property" also bears some weight on the issue of whether the party will suffer special damages, but status as an adjacent landowner alone is insufficient to confer standing. *Mangum*, 362 N.C. at 644, 669 S.E.2d at 283.

In *Kentallen*, the petitioner was an adjoining landowner who challenged the issuance of a special exception permit to the respondents allowing construction of a "thirty-foot by thirty-five-foot addition to a metal storage building" which was "located less than the required twenty feet from the rear boundary" of the respondents' lot; the building was a nonconforming use under the applicable ordinance. *Kentallen*, 110 N.C. App. at 768, 431 S.E.2d at 231-32. The petitioner alleged that the view of the building "would not be visually attractive." *Id.*, 431 S.E.2d at 231-32. This Court held that the petitioner was not an aggrieved party:

> In this case, [the petitioner's] allegation that it is the "owner of adjoining property" does not satisfy the pleading requirement, in that there is no allegation relating to whether and in what respect [the petitioner's] land would be adversely affected by the [Board of Adjustment for the Town of Hillsborough's] issuance of the special exception permit. Furthermore, the evidence presented before the Board, that the requested construction would increase "the

negative impact" on the petitioner's property and "would not be visually attractive," is much too general to support a finding that [the petitioner] will or has suffered any pecuniary loss to its property due to the issuance of the permit.

*Id.* at 770, 431 S.E.2d at 233 (brackets omitted).

Vague, general allegations that a property use will impair property values in the general area also will not confer standing. In *Lloyd v. Town of Chapel Hill*, this Court held that the parties' allegation that they "owned property in the immediate vicinity of that upon which variances [from a town ordinance] had been sought and that grant of the variances would materially adversely affect the value of [their] property" did not demonstrate "special damages distinct from the rest of the community." *Lloyd v. Town of Chapel Hill*, 127 N.C. App. 347, 351, 489 S.E.2d 898, 900 (1997) (citation, quotation marks, and brackets omitted). Similarly, in *Davis v. City of Archdale*, this Court held that the parties' allegation that rezoning ordinances would diminish the value of their property because they would increase "traffic on roads which already carry traffic volumes in excess of capacity and [would] increase[] demands upon already overburdened public utilities" did not demonstrate "special damages distinct from those of the rest of the community." *Davis v. City of Archdale*, 81 N.C. App. 505, 508, 344 S.E.2d 369, 371 (1986). In these cases, although the challengers to the land use alleged impairment of property values, the allegation was general for the entire neighborhood or area and not specific to a certain parcel of

property. *See id.*, 344 S.E.2d at 371; *Lloyd*, 127 N.C. App. at 351, 489 S.E.2d at 900. And we note that even assuming that respondent's allegations are true and the proposed use will actually adversely affect property values in the general vicinity, because this type of effect is not distinct to the particular landowner who is challenging a land use, this factor alone does not confer standing. *See Davis*, 81 N.C. App. at 508, 344 S.E.2d at 371; *Lloyd*, 127 N.C. App. at 351, 489 S.E.2d at 900.

Several cases have provided examples of the types of special damages which will give a landowner standing to challenge a land use decision. In *Mangum*, our Supreme Court held that several adjacent and nearby landowners' allegations that the issuance of a special use permit for the construction of an adult establishment would cause "vandalism, safety concerns, littering, trespass, and parking overflow from the proposed business to [the parties'] adjacent or nearby lots" demonstrated special damages. *Mangum*, 362 N.C. at 645-46, 669 S.E.2d at 283-84. Similarly, in *Sanchez*, the petitioner's home was in a waterfront historic district across the street from the "Carpenter Cottage"; the respondent purchased the Carpenter Cottage and applied for a permit to demolish the cottage and build a one-and-one-half story structure which would block the petitioner's view of the water. *Sanchez*, 211 N.C. App. at 575-76, 710 S.E.2d at 351-52. The petitioner objected to the height of the respondent's proposed structure. *Id.* at 576, 710 S.E.2d at 352. The historic commission denied the application due to the proposed structure's height; the

respondent appealed to the board of adjustment, which found that the commission's height limitation was "arbitrary and capricious" and remanded to the commission for issuance of a permit. *Id.* at 577, 710 S.E.2d at 352. The superior court affirmed the decision of the board of adjustment, and this Court affirmed. *Id.* at 577, 583, 710 S.E.2d at 352, 356. On the issue of standing, this Court noted the petitioner's allegations that the proposed structure "would interfere with her use of her property by causing her to lose her private waterfront view" and that "the loss of this view would reduce the value of [her] property by at least $100,000" as sufficient to show that she suffered special damages. *Id.* at 579, 710 S.E.2d at 353-54.[4]

In this case, respondent alleged that she would suffer special damages because the Cherry-Gordon house is "directly across the street from her home" and that its architectural incongruity would "harm the character of the neighborhood and contribute to erosion of the neighborhood's value[.]" On appeal, her arguments are purely aesthetic or are not distinct to her property. She notes that her

> home sits directly across from the Cherry-Gordon property on a narrow street with no sidewalks. The front setbacks are especially shallow, with the two-story Cherry-Gordon dwelling only less than fifteen feet from the curb. [Respondent's] home features a wide front porch and many front windows.
> At the September 2013 [Commission] meeting,

---

[4] But as to the substantive issue—the approval of the proposed structure—the petitioner lost, since this Court agreed with the board of adjustment that the commission's height limitation was arbitrary. *Id.* at 582-83, 710 S.E.2d at 356. In other words, the damage to the petitioner's property value and view gave her standing but did not determine her claim on the merits. *See id.*, 710 S.E.2d at 356.

> [respondent] opposed the 516-COA application for including multiple incongruous elements. Taking that allegation of incongruity as true, the Cherry-Gordons' proposed design would have dominated the view and vista from [respondent's] front windows, porch and yard with an incongruous structure. [Respondent] also addressed several adverse effects that would result [from] such incongruity, including reduced property values and impaired enjoyment of the neighborhood.

(Citations omitted.)

But these allegations do not demonstrate special damages *distinct to respondent*, other than the view from her front porch; rather, respondent alleges a generalized damage to the overall neighborhood—"reduced property values and impaired enjoyment of the neighborhood." The mere fact that respondent's home is "directly across the street" from the Cherry-Gordon house does not constitute special damages. *See Mangum*, 362 N.C. at 644, 669 S.E.2d at 283; *Kentallen*, 110 N.C. App. at 770, 431 S.E.2d at 233. Respondent's allegation is akin to the allegations in *Kentallen*, *Lloyd*, and *Davis*, where this Court held that the party had failed to allege special damages. *See Kentallen*, 110 N.C. App. at 770, 431 S.E.2d at 233; *Lloyd*, 127 N.C. App. at 351, 489 S.E.2d at 900; *Davis*, 81 N.C. App. at 508, 344 S.E.2d at 371; *Sarda v. City/Cty. of Durham Bd. of Adjust.*, 156 N.C. App. 213, 215, 575 S.E.2d 829, 831 (2003) ("Petitioners' mere averment that they own land in the immediate vicinity of the property for which the special use permit is sought, absent any allegation of special damages distinct from the rest of the community in their Petition, is

insufficient to confer standing upon them.") (citation and quotation marks omitted).

Respondent makes no allegation of damages particular to her property like the

allegation of potential "vandalism, safety concerns, littering, trespass, and parking

overflow" in *Mangum* or the allegation of the loss of a waterfront view and the

resulting reduction of market value of the property in *Sanchez. See Mangum*, 362

N.C. at 645-46, 669 S.E.2d at 283-84; *Sanchez*, 211 N.C. App. at 579, 710 S.E.2d at

353-54. Because respondent has failed to even *allege* special damages, she is not an

aggrieved party and thus lacks standing to contest the Committee's decisions. *See*

*Casper*, 186 N.C. App. at 458, 651 S.E.2d at 301; N.C. Gen. Stat. § 160A-400.9(e).

iii.     Respondent's Opportunity to Allege Standing

Respondent responds that she did not have an opportunity to allege standing

before the Board. But respondent's argument is not so much that she did not have

the opportunity but that she did not realize that she needed to make a showing of her

special damages. She actually had multiple opportunities to allege standing before

the Board. After retaining counsel, respondent submitted two separate Applications

for Review of the Committee's decisions to the Board. The Applications for Review

were on forms provided for this purpose. The form has some instructions and

questions with blanks for answers. The second page of the form includes the following

section of instructions:

> General Statute 160A-400.9(e) provides that "An appeal
> may be taken to the Board of Adjustment from the

Commission's action in granting or denying any certificate, which appeals (i) may be taken by any aggrieved party, (ii) shall be taken within times prescribed by the preservation commission by general rule, and (iii) shall be in the nature of Certiorari. Any appeal from the Board of Adjustment's decision in any such case shall be heard by the Superior Court of the County in which the municipality is located."

Appeals in the nature of Certiorari means that the Board of Adjustment may review your case, but any review must be on the record of the case presented to the Commission and no new evidence can be introduced at this hearing.

To clearly present your case, attach to this application the adopted minutes of the Commission meeting(s) **(attached hereto as Exhibit A)**,[5] copies of your COA application, any exhibits presented to the Commission during the hearing(s), copies of pertinent excerpts from the rules of procedure of the Commission, and any other relevant documents that were presented at the hearing. These copies must be obtained from the Commission to ensure that they are from the official record of the case. The Commission will forward any physical evidence in the record (photos, material samples, audiotape, etc.) to the [Board] for review during the hearing on your appeal.

**EXPLAIN TO THE BOARD HOW YOU ARE AN AGGRIEVED PARTY:**

The Application for Review form quotes the applicable statute, N.C. Gen. Stat. § 160A-400.9(e), as we discussed above, and explains the appeal process. In boldface and capitalized letters, the Application for Review form then asks the applicant to explain why she has standing, since only an "aggrieved party" may have standing to

---

[5] Respondent inserted this portion in bold in her first Application for Review and attached the minutes of the Committee's 9 September 2013 hearing as Exhibit A. The remainder of the text quoted is from the form itself.

challenge the Commission's decision. Respondent argues: "Allowing the City [of Raleigh] to successfully challenge standing on the basis of an application that uses the word 'aggrieved,' but without any language as to special damages, would be contrary to the concept and principles of notice pleading." Essentially, respondent argues that her application was sufficient to give "notice" of the basis for her claim, and that she should not be required to set forth specific allegations of her special damages, particularly since the Application for Review form did not set forth a definition of the term "aggrieved party." But the Application for Review form goes above and beyond the call of duty in setting forth the applicable statute and general appeal procedure. Ignorance of the law is no excuse; a party does not need notice that she must allege standing because standing is a jurisdictional prerequisite and the complaining party bears the burden of alleging in its pleadings that it has standing. *See Smith*, 186 N.C. App. at 653, 652 S.E.2d at 357; *Kentallen*, 110 N.C. App. at 769, 431 S.E.2d at 232; *Neuse River Found.*, 155 N.C. App. at 113, 574 S.E.2d at 51; N.C. Gen. Stat. § 160A-400.9(e). In addition, even after the Commission moved to dismiss her appeal for lack of standing and the Board invited the parties to submit written responses, respondent failed to allege special damages.

Respondent also notes that the Board did not properly consider the issue of standing and if it had, she would have sought to supplement her evidence earlier in the process. Essentially, this argument is that the Board failed to directly address

her standing and if it had, she would have submitted additional evidence. We agree that the Board should have explicitly ruled upon the Commission's motion to dismiss for lack of standing, but as the Board's counsel noted at the 10 March 2014 hearing, the Board obviously found that respondent had standing since otherwise it would not have considered respondent's appeal and ruled in her favor. But standing is a jurisdictional issue, which this Court would have to consider on appeal *de novo*, even if the Commission had not filed a motion to dismiss raising this defense, and even if the Commission, Board, and Superior Court had all failed to address it. *See Fort*, 218 N.C. App. at 404, 721 S.E.2d at 353 ("Whether a party has standing to maintain an action implicates a court's subject matter jurisdiction and may be raised at any time, even on appeal.") (citation and quotation marks omitted).

Even though the Board failed to directly rule upon the motion to dismiss, this does not relieve respondent of her burden to allege standing in her pleadings since standing is a jurisdictional prerequisite. *See Smith*, 186 N.C. App. at 653, 652 S.E.2d at 357; *Kentallen*, 110 N.C. App. at 769, 431 S.E.2d at 232; *Neuse River Found.*, 155 N.C. App. at 113, 574 S.E.2d at 51; N.C. Gen. Stat. § 160A-400.9(e). In any event, the Commission raised the issue of respondent's standing in its first responsive pleading, thus highlighting the need for support for her status as an aggrieved party. In sum, we hold that respondent had multiple opportunities to allege standing before the

Board. We therefore hold that the trial court did not err in concluding that respondent lacked standing despite the Board's failure to directly address the issue.

B. Respondent's Motion to Supplement the Record

Respondent next contends that the trial court erred in denying her motion to supplement the record to include two affidavits addressing the issue of standing. One was her own affidavit and the other an affidavit from Michael R. Ogburn, a real estate appraiser.

i. Standard of Review

N.C. Gen. Stat. § 160A-393(j) provides that the trial court "may, *in its discretion*, allow the record to be supplemented with affidavits, testimony of witnesses, or documentary or other evidence if, and to the extent that, the record is not adequate to allow an appropriate determination of the following issues: (1) Whether a petitioner or intervenor has standing." N.C. Gen. Stat. § 160A-393(j) (2013) (emphasis added). "To demonstrate an abuse of discretion, the appellant must show that the trial court's ruling was manifestly unsupported by reason, or could not be the product of a reasoned decision." *Terry's Floor Fashions, Inc. v. Crown Gen. Contr'rs, Inc.*, 184 N.C. App. 1, 17, 645 S.E.2d 810, 820 (2007) (citation omitted), *aff'd per curiam*, 362 N.C. 669, 669 S.E.2d 321 (2008).

ii. Analysis

Respondent moved to supplement the record to include two affidavits addressing the issue of standing. Respondent's brief fails to state any reason why the trial court's decision not to allow supplementation of the record was "manifestly unsupported by reason[.]" *See id.*, 645 S.E.2d at 820 (citation omitted). The legal authority cited for her claim of abuse of discretion is a general reference to our Supreme Court's statement in *Mangum* that

> the North Carolina Constitution confers standing on those who suffer harm: "All courts shall be open; and every person for an injury done him in his lands, goods, person, or reputation shall have remedy by due course of law."
> N.C. Const. art. I, § 18.

*See Mangum*, 362 N.C. 642, 669 S.E.2d at 281-82 (brackets and ellipsis omitted). This statement is true, but it does not explain how the trial court may have abused its discretion in denying respondent's request to supplement the record. As discussed above, the initial appeal form directed respondent to state why she was an "aggrieved party," but she failed to allege any special damages. The Commission raised the issue of respondent's standing before the Board, and respondent again had multiple opportunities before the Board to present evidence to support her standing but failed to do so. In fact, respondent's motion to supplement was not filed until 7 August 2014, about nine months after her initial Application for Review in which she had the burden of demonstrating why she would have standing to obtain review and only 18 days before the 25 August 2014 hearing before the Superior Court. This delay alone

could justify the trial court's discretionary denial of her motion. In addition, respondent had already submitted a tremendous amount of information as part of her opposition to the Commission's approval; the record in this case is over 1,200 pages.

We also note that the affidavits which she proffered as supplements add very little new substantive information to the already voluminous record and would not have provided a basis for standing. Respondent's own affidavit details the location of her home, her education and experience as a real estate broker, her opinion that the Cherry-Gordon house is "significantly incongruous" with the Oakwood Historic District, and details regarding the neighborhood. The only item of alleged impact upon respondent's property which could arguably be considered as distinct from the entire neighborhood noted in the affidavit is her complaint of increased traffic from people "gawk[ing]" at the "modernist house[.]" As "an example" of the Cherry-Gordon house's impact on her property, she avers:

> [N]ews reporters and other media agents staked out in front of and around my property waiting to ambush me with the intention of obtaining unscheduled interviews. Upon information and belief, it is [petitioners] and their agents who have fomented a significant amount of media coverage in this matter. This unwanted attention creates ingress and egress problems as well as a significant amount of anxiety for my husband and [me]. As a result of stories published in, among others, the News & Observer, Vanity Fair, Boston Globe, Seattle Times, and New York Times as well as a feature on the Today Show, I have received dozens of unsolicited emails and phone calls

> expressing rude, harassing, and graphic commentary on my involvement in this matter, even though I am only exercising my statutory right to seek review of a COA approval.

Even if the Cherry-Gordon house has generated increased "gawk[er]" traffic and unwanted media attention, respondent's affidavit indicates that the traffic increased due to the publicity surrounding the challenge to the construction of the Cherry-Gordon house. This is simply not the sort of increased traffic our prior cases have addressed as part of the basis for standing of an adjacent property owner to challenge a permit, since traffic is not generated by the usual or intended use of the Cherry-Gordon house or property itself but is generated only by the media coverage of the controversy surrounding its construction. The Cherry-Gordon house is a 2,580-square-foot single-family residence, and the record shows that it would generate exactly the same type of "traffic" in its normal use as respondent's home or any other single-family residence of similar size.

The second affidavit provides some additional information regarding respondent's allegations regarding impairment of property values. The affidavit of Michael R. Ogburn details Mr. Ogburn's qualifications as a real estate appraiser and his opinion that respondent's property "will be adversely affected in terms of property value and marketability by the existence of the [Cherry-Gordon house] and that those effects, from a residential housing market standpoint, would be significant." This affidavit could arguably demonstrate a claim of special damages due to a decrease in

respondent's property value (and not to the property values in the neighborhood generally), but as noted above, allegations of a decrease in value alone are not sufficient. *See Fort*, 218 N.C. App. at 404, 721 S.E.2d at 353 ("A property owner does not have standing to challenge another's *lawful* use of her land merely on the basis that such use will reduce the value of her property."). Although the parties dispute whether the Cherry-Gordon house is architecturally congruous with the Oakwood Historic District, petitioners' use of the property for a single-family residence is clearly lawful, and Mr. Ogburn's affidavit does not address any sort of secondary impacts upon respondent's property, such as traffic, noise, light, odors, runoff, or any other sort of potential damage generated by the use of petitioners' property. Overall, the trial court's decision to deny the motion to supplement was entirely reasonable, and we hold that the trial court did not abuse its discretion in denying respondent's motion to supplement the record.

## III. Conclusion

For the foregoing reasons, we affirm the trial court's order.

AFFIRMED.

Judges CALABRIA and McCULLOUGH concur.